STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| Hamm Mine Reclamation | } | |
| Act 250 Jurisdictional Opinion #2-241 | } | Docket No. 271-11-06 Vtec |
| | } | |

### Decision on Appellants' Motion for Summary Judgment

This appeal arises out of Jurisdictional Opinion #2-241 (JO #2-241), issued by the District #2 Coordinator on October 26, 2006. JO #2-241 asserts that the Hamm Talc Mine property, covered by Land Use Permit #2W0551 and its amendments, remains under Act 250 jurisdiction.

Appellants Luzenac and U.S. Talc Co., Inc. ("Luzenac") are represented by George McNaughton, Esq.; Appellants Sean and Elizabeth Reese are represented by Richard D. Perra, Esq.; Appellee B.W. McCandless Trust is represented by Robert E. Woolmington, Esq.; and the Land Use Panel of the Natural Resources Board ("NRB"), appearing in this proceeding as an Interested Person, is represented by Melanie Kehne, Esq.

Luzenac has moved for summary judgment and Appellee McCandless and Interested Person NRB have filed an opposition thereto. For the reasons expressed below, we decline to grant Luzenac the requested summary judgment.

### Factual Background[1]

*A.)  General History/Background*

1. Appellants Sean and Elizabeth Reese are the current owners of the former Hamm Talc Mine located at 1220 White Road in Windham, Vermont. The entire property consists of approximately eighty-four acres, of which the former open pit mine encompasses about nine acres. Appellants Reese purchased the property from Luzenac in 2002, after all mining operations had ceased.

2. Luzenac is the former operator of the Hamm Mine and is the permittee listed on Land Use Permit #2W0551, issued on October 22, 1982 and subsequently amended.[2] Luzenac did not

---

[1] All facts are undisputed unless otherwise noted. For purposes of this motion only, we view the material facts in a light most favorable to the non-moving parties.

[2] The record currently before this Court does not appear to include copies of all amendment applications filed by, or amended permits issued to, the Hamm Mine operators.

1

extend Permit #2W0551 and allowed it to expire on October 15, 2002. Luzenac then sold the property to Appellants Reese in 2002 after the expiration of Permit #2W0551.

3.      Appellee B.W. McCandless Trust (McCandless) is the current owner of 201 acres of land located at 1483 White Road, Windham, Vermont. The McCandless property abuts the Reese property, with the location of the former mine being close in proximity to the western boundary of the McCandless land. The McCandless property consists of an 1820s-era farmhouse and large post-and-beam barn on the easterly side of White Road. The residence sits in an open meadow, and the McCandless property includes several fields on both sides of White Road. The general lay of the land adjoining the farmhouse tends from uphill in the northwest to downhill in the southeast, reaching the low point at "Shade Brook" to the east of the McCandless house.

4.      White Road runs in a northwest/southeast direction, dividing the McCandless land. White Road is a Class III town highway under the control and responsibility of the Town of Windham.

5.      Upon cessation of mining activities, the open pit mine filled with water to become a nine acre pond. In 2003, the mine pond began overflowing at its northeastern corner along the Town's road onto the McCandless property.

*B.)      History of Land Use Permit #2W0551 and its Amendments*

6.      In 1981, Appellants U.S. Talc and Luzenac[3] acquired three contiguous parcels in Windham, including the Hamm Mine parcel. The Hamm Mine parcel, which consists of approximately eighty-four acres, was conveyed from the Hamm Family to Vermont Talc, a division of OMYA, Inc., on July 31, 1981.

7.      On October 22, 1982, the District #2 Environmental Commission ("Commission") issued Land Use Permit #2W0551 to Vermont Talc, a division of OMYA, Inc., to construct and operate a talc mine in Windham, Vermont. Permit #2W0551 required that the development be completed in accordance with the plans and exhibits stamped "Approved" and that any changes to the project required written approval of the Commission. Permit #2W0551 at ¶ 1.

_____

[3] The parties failed to submit a complete record describing the corporate relationship between U.S. Talc Co. Inc., Luzenac America Inc. and Vermont Talc, a division of OMYA, Inc. However, it appears Vermont Talc, a division of OMYA, Inc. was the original permittee and upon cessation of mining activities, prior to 2002, Luzenac became the successor permit holder.

2

8.      The Findings of Fact[4] that accompanied Permit #2W0551 noted the applicant's plan to pump water from a settling basin in the mine to a holding pond.  The site map stamped "Approved" in connection with this initial application shows that this pond was to be constructed at the southeast corner of the mine.  Water was to flow or be pumped into this pond from the mine, so as to provide two to three day holding time for any suspended solids to settle out of the water. The Permit required that this pond was to be cleaned out as needed.  The applicant's plan called for the water to then flow from this settlement pond, through an outlet pipe, onto a rip raped swale and then discharge onto lands further to the southwest.  The applicant agreed to install a gate valve to reduce potential sedimentation in the natural drainage during clean-out periods.

9.      This particular settlement pond and discharge structure was never constructed, nor was the permit amended to authorize its omission.[5]  There has been no representation by any party that there was a permit amendment issued by the Commission authorizing the omission of this settlement pond, discontinuance of the swale, adjustments to the overburden area, or re-location of one or more of the holding ponds.

10.     The Findings of Fact also determined that the mine and its support structures, if constructed as represented, would not create erosion, or negatively impact on the capacity of the land to hold water,[6] but the Commission reserved the right to add additional permit conditions at any time to ensure that erosion would not become a problem.  In addition, the applicant agreed to seek an amendment if it intended to undertake any work that would change the quantity or quality of the runoff away from the property.  Id. at ¶ 4(E) on p. 3.

---

[4]  When an Act 250 application is deemed a "major" application, the Commission will conduct a site visit, one or more hearings to take evidence, and issue formal written Findings upon which its permit or denial of a permit is based, all pursuant to former Environmental Board Rule 2.

[5]  Luzenac advises that the original plan for this settlement pond and discharge structure was discarded because of concerns that the structure was incapable of handling the expected water discharge.  Therefore, the applicant changed its plan for sediment treatment by designing and constructing an alternate set of settlement ponds to the north of the mine, in a portion of the area designated for overburden.  This new plan called for water to be pumped out of the bottom of the quarry to the first retention pond, where the sediment dropped out and the clearer water went to a smaller pond, where the water would gradually percolate into the ground.  Luzenac asserts that Commission staff had notice of this alternate pumping procedure during the operation of the mine, which fact is not disputed by the NRB.  It is also undisputed that the record presently before us reveals that no amendment to the original permit was applied for or issued.

[6]  The record presently before us suggests that the original applicant, when filing the original Act 250 permit application, filed a response to the specific Act 250 Criteria, commonly referred to as a Schedule B, which is referenced in the Findings of Fact as "Exhibit 3," which includes the following representations:  "When mining is completed and pumping stops, the tunnels and entrances will fill up with water to the level of the natural water table. This will create a pond at the site of this development which will be available as a town reservoir."

3

11.     In the Findings of Fact, the Commission discussed a brief reclamation plan for the mine site. The single reclamation plan condition requires that the opening of the mine be the final grade for closing of the mine. Thus, it was planned that the project would have shallow slopes leading down to a stable water level in the open portion of the mine, so the resulting pond could be used for recreation or as a fire department water pond.[7]

12.     Land Use Permit #2W0551 provided that it would "expire on October 15, 2002, unless extended by the District Commission." Id. at ¶ 8.

13.     The Permit was amended on September 18, 1984 to allow construction of a new entrance ramp and to alter the method of mining. In the Findings of Fact that accompany Amended Permit #2W0551-1, the Commission found that the "land area to be disturbed for the proposed changes will not increase runoff significantly."[8]

14.     On October 2, 2002, Luzenac wrote a letter to the Assistant District #2 Coordinator in which it represented its full compliance with the permit conditions and outlined the company's future plans for the property, which were to let the permit expire and sell the property.

15.     In 2002, Appellants Reese purchased the property from Luzenac. Per their Purchase Sale Contract and the deed they accepted at closing, the Reese's agreed to take the property "As-Is."

*C.)     History of Jurisdictional Opinions Related to Land Use Permit #2W0551*

16.     On December 10, 2002, Assistant District #2 Coordinator Patrick Dakin issued Jurisdictional Opinion (JO) #2-169, addressing the question of whether Act 250 jurisdiction continued on the Hamm Mine property, such that the property continued to be subject to Land Use Permits #2W0551 and its amendments, despite the fact that the expiration date for the Permit had passed. Assistant District Coordinator Dakin responded to a specific request for a "statement regarding the reclamation of the site according to the terms of its Land Use Permit"[9] by issuing JO #2-169.

---

[7]  There is disparity in the original grade of the mine shown on the several maps submitted. A 1982 map shows the top cut of the mine to be at 1910 feet, a 1988 map shows that the draining location on one edge of the mine to be 1875 feet and a recent map shows the final grade to be set at 1870 feet.

[8]  It appears that there may be at least 5 amendments to Permit #2W0551, but the record before us discusses only the original permit and this 1984 amendment.

[9]  This request was made by Tatha Wells, Esq. on behalf of Appellant Sean Reese who had entered in a purchase and sales contract to purchase the property from Luzenac.

4

17.     JO #2-169 indicates that "the Permittee has completed reclamation as required by the permits, and based on current information,[10] the project appears to be in compliance with the expired permits." However, the JO indicates "although the permit may have expired, jurisdiction over this parcel remains in effect."

18.     On December 17, 2002, Attorney Wells requested reconsideration of JO #2-169. On December 26, 2002, Mr. Dakin responded with a denial of Attorney Wells's request for reconsideration. JO #2-169 was not appealed. Soon after, Appellants Reese completed their acquisition of the property.

19.     On November 26, 2003, Assistant District #2 Coordinator Linda Matteson wrote to Appellant Reese, reminding him that the property was still under Commission jurisdiction and indicated it was Appellant Reese's responsibility to address the impact from the recent mine pond overflow. Additionally, the letter cites the conditions relating to erosion and water control from Permit #2W0551 and suggests Appellant Reese retain a professional engineer to assist in resolving the mine overflow issue.

20.     In 2005, Attorney William Dakin requested a separate jurisdictional opinion for a client, seeking a determination of whether the Land Use Permits issued for the Hamm Mine parcel encumbered an abutting "Yeager parcel." Although the Yeager parcel was also owned by Luzenac, it was not part of the approximately eighty-four acres subjected to Land Use Permit #2W0551 and its amendments. In response to Attorney Dakin's specific request regarding the Yeager parcel, Assistant District Coordinator Matteson issued an unnumbered JO which stated that the Yeager parcel was not subject to Act 250 jurisdiction because of the Hamm Mine activities. Ms. Matteson's JO reflects that she relied on a letter dated December 10, 2002, from Assistant District Coordinator Patrick Dakin regarding the Hamm Mine parcel, which stated that "the Permittee has completed reclamation as required by the permits, and based on current information, the project appears to be in compliance with the expired permits." Ms. Matteson's JO also reflects that she relied on the Vermont Supreme Court Huntley[11] decision, which held that the Huntley land was no longer subject to Act 250 jurisdiction because its gravel pit was reclaimed and the permit had expired.

---

[10]  This statement refers to information provided by Luzenac's Environmental and Community Affairs Manager, Henry Clay.

[11]  In re Huntley, 2004 VT 115.

*D.)     History of Environmental Impacts Related to Hamm Mine*

21.     Beginning in 1982, OMYA, Inc. excavated the nine-acre open-face Hamm Mine to an eventual depth of 140 feet. Vehicle access to the heart of the mine was provided by a roadway which spiraled down the mine face. The creation of the mine required the removal and relocation of the equivalent of eleven acres of trees,[12] vegetation, topsoil and bedrock.

22.     Throughout the duration of mining operations, the mine required constant pumping of accumulating water. This accumulation of water was due to surface drainage from an approximately thirty-acre watershed, as well as subsurface springs opened due to the excavation of the mine.[13] The water was pumped to holding ponds on the Hamm property to the northwest of the mine. While the mine was operating and the water was being pumped, there was no discernable effect on the observable discharge of water from the Hamm property toward the McCandless property.

23.     In 1997, OMYA ceased its mining operations, including the routine pumping of accumulating water from the mine to the holding ponds. Without the active pumping, the mine began to fill up with water at a rate of approximately twenty vertical feet per year. By spring 2003, the mine was completely filled and overflowing. An unplanned outflow emerged at the northeast corner of the mine which flowed as a continuous stream into the ditches along White Road onto the McCandless property.

24.     Historic flows from the watershed on the Hamm parcel have always discharged across the McCandless lands following the downhill topography to Shade Brook. However, the current pattern of drainage and dispersal demonstrates a deleterious change from historic flows.

25.     This overflow has caused erosion of Appellee McCandless' property, as well as sedimentation buildup in ditches along and culverts underneath White Road.[14] An August 2003 storm event increased the overflow so that it washed out a portion of White Road into the McCandless fields.

26.      The continuous overflow caused some portion of the McCandless' fields to become saturated and muddy, such that they hinder machinery and prevent mowing.

---

[12]  Luzenac contends that the quarry site prior to excavation was an abandoned pasture that was in the process of forest succession and, thus, was not heavily wooded. This is to suggest that the removal of vegetation had a negligible effect on the ability of the soil to absorb precipitation.

[13]  Luzenac asserts that the water accumulating in the former mine is caused substantially by surface runoff.

[14]  Luzenac asserts that the erosion issues and sedimentation buildup are caused by the Town of Windham's poorly maintained ditch system off White Road and not from the discharge off the Reese property. Further, they dispute the fact that any erosion is occurring on the previously permitted site.

27.     Wetlands have emerged on the McCandless property due to the increased saturation. Wetland vegetation, such as cattails, is established and the soils are increasingly hydric in nature.[15]

28.     The Hamm Mine pond's spillage point functions as an unplanned spillway over an earthen dam.  The capacity of the mine to retain water, and in cases of overflow, to act as a spillway, has not been tested nor certified by any engineer nor regulating authority.

29.     On November 13, 2006, Luzenac completed an Elevation Review of the Hamm Mine site.  The survey indicated that the current pit lake water level is +/- 1873 Ft., with a continuous overflow.  The reclamation plan anticipated an elevation for the pit lake water level to be stabilized at +/- 1870 Ft.

*E.)     Related Proceedings in Windham Superior Court*

30.     The Town of Windham, as plaintiff, and the McCandless family, as intervener, initiated legal action in October 2003 against the current owner of the Hamm Mine, Sean and Elizabeth Reese, in Windham Superior Court.[16]  The plaintiff-interveners were seeking compensatory damages and injunctive relief stemming from the continuous overflow out of the Hamm Mine pond.  This action was tried on October 9-12, 2006.

31.     On April 4, 2007, Windham Superior Court Judge Wesley issued an Order entering a declaratory judgment in favor of Plaintiff-Intervener on their claim that the defendants failed to control the flow of water to approximate historic levels, and that such failure has caused significant present and continuing injury to each of the plaintiffs.  The Court, however, entered judgment in favor of Defendants on the Plaintiff-Interveners' claim for compensatory damages.  Finally, the Court granted the Plaintiff-Interveners' prayer for injunctive relief.

32.     On August 14, 2007, Windham Superior Court Judge Wesley issued an Order of Injunctive Relief to establish a plan to prevent further injury to plaintiff-interveners.  According to this Order, the Defendants were required to "take immediate steps to lower the surface of the Hamm Mine pond by at least fifteen feet from the elevation at which water commences to spill over the edge, which is to be accomplished no later than October 1, 2007, unless good cause was shown that they were incapable of complying."   The Order also instructed that "Defendants shall

---

[15]  Luzenac contends that the McCandless soils are historically hydric, and that they were temporarily dried during mining operations due to the pumping of mine water to an upland holding pond. Appellee McCandless disputes this assertion.

[16]  Town of Windham v. Reese et al., Docket No. S546-10-03 Wmcv, (Windham Superior Court, April 4, 2007).

with all deliberate speed take necessary steps to design, obtain necessary permits and construct a permanent regulated outflow system that ensures that the level of the water in the pond does not rise higher than two feet below the level at which it commences to spill, unless a higher elevation is approved pursuant to a regulatory permit. The regulated outflow system shall be designed to reduce the impact of outflow from the pond on the Town's ditches and culverts and the Intervener's fields, such that: i) the ditches and culverts are not unduly clogged with sediment; ii) White Road is not regularly subject to ice sheeting; iii) wetland formation is abated in the McCandless fields; and iv) erosion to the McCandless fields is limited to that consistent with historic flows." Defendants were also required to furnish completed engineering and construction plans, subject to regulatory approval, no later than December 15, 2007.

33. Luzenac was not a party to the Windham Superior Court proceeding.

*F.) Jurisdictional Opinion #2-241*

34. Byron and Mary McCandless were granted party status by the District #2 Commission under Criteria 8 (Aesthetics) and 9(B) (Primary Agriculture Soils) on Amended Land Use Permit #2W0551-1.

35. By letter dated August 15, 2006, Appellee James McCandless sought a jurisdictional opinion from the District Coordinator regarding the applicability of Act 250 to the Hamm Mine property.

36. On October 26, 2006, District Coordinator April Hensel issued JO #2-241, finding that the mine property remained subject to Act 250 jurisdiction.

37. Luzenac and Reese thereafter appealed JO #2-241 to this Court.

## Discussion

This appeal raises the narrow issue of whether Act 250 jurisdiction, originally conferred by Permit #2W0551, remains attached to the Hamm Mine property. Appellants have moved for summary judgment that Act 250 jurisdiction no longer applies to the Hamm Mine property because (1) the reclamation plan was deemed complete in JO #2-169; (2) Land Use Permit #2W0551 expired on October 15, 2002; and (3) under the Huntley doctrine, when reclamation is completed and a mineral extraction permit is expired, Act 250 jurisdiction ends. These issues implicate all fifteen issues raised in Appellants' Statement of Questions.

Summary judgment is only appropriate "when there are no genuine issues of material fact and, viewing the evidence in a light most favorable to the non-moving party, the moving party is

8

entitled to judgment as a matter of law." In re Carter, 2004 VT 21, ¶ 6 (citation omitted); V.R.C.P. 56(c).

## Compliance with Permit #2W0551 and Amendments

Typically, determining Act 250 jurisdiction is an issue that arises at the commencement of a development. "Under Act 250, commencing development triggers jurisdiction and the obligation to obtain a permit." In re Huntley, 2004 VT 115, ¶ 9; 10 V.S.A. § 6081. In regards to the Hamm Mine, there is no dispute that the original construction and operation of the mine required an Act 250 permit, or that the mine operator received a permit. See 10 V.S.A. § 001(3)(a). In the present case, however, the jurisdictional determination on appeal was made subsequent to mining operations.[17] All mining operations ceased almost ten years prior, Permit #2W0551 expired in 2002, and that same year, the mine operator sold the property and moved on with its business.

To determine whether Act 250 jurisdiction continues on the Hamm Mine property, we must first examine Luzenac's, and its predecessors in interest's, compliance with Permit #2W0551 and its amendments. The record before us does not reveal any permit or amendment approval from the Commission authorizing the discontinuance of the swale, the adjustment to the overburden area, or the re-location of the holding ponds from that which was depicted in the original permit application site plans. Luzenac contends that the Commission staff was aware of the actual re-location for the holding ponds because the ponds were mapped on the reclamation plan. We find this argument unpersuasive, since the reclamation plans did not highlight this change for the Commission or its staff. Luzenac has also failed to provide any documentation of a permit amendment authorizing this change. We do not intend to suggest that the practices employed by the permittee were improper; merely that these material changes appear to have been done without prior permit or amendment approval.

Once Act 250 jurisdiction attaches, the Act 250 Rules[18] require an amendment for any material change[19] to a permitted development. Act 250 Rule 34(A), Vt. Code R. 12 004 60

---

[17] The post-expiration jurisdiction determination was issued on October 26, 2006, (in the form of JO #2-241) and is in addition to the determinations made at the commencement of mining activity in 1982, and again in 2002.

[18] The Act 250 Rules, enacted by the NRB on May 1, 2006, govern the JO that is the subject of this appeal. The Act 250 Rules were preceded by the Environmental Board Rules, which governed the prior jurisdictional opinions referenced in this decision, as well as the procedures Luzenac needed to follow in requesting an amendment to Permit #2W0551. We are not aware of any material difference between the provisions of either set of Rules that would impact on the issues arising in this case.

9

(2007). Here, it is undisputed that there were material changes to the permitted development to alter the topography, grades, discharge points and ultimately, the capacity of the land to hold water.

Luzenac argues that JO #2-169 is a final determination that the mine site is in compliance with the reclamation plan and that, upon permit expiration, Act 250 jurisdiction has ceased and cannot, under any circumstances, be re-opened. The court finds this argument lacks merit. A jurisdictional opinion is "only as good as the facts upon which it is based." Re: Dexter and Susan Merritt, Declaratory Ruling #407, Mem. Decision, p. 6 (Vt. Envtl. Bd., June 20, 2002), aff'd by, In re Merritt, 175 VT 624 (Vt. Supreme Court, Sept. 12, 2003). Here, JO #2-169 was issued in reliance upon representations made by Luzenac that the permittee was in full compliance with all permit conditions.[20] However, had Luzenac presented the District Coordinator or her assistants with all the data concerning the rapid accumulation of water, the foreseeable mine pond overflow and relayed the hydrology concerns expressed by Appellee McCandless, the District Commission may not have allowed the permit to expire. While this Court recognizes the clarity afforded by hindsight, it will not be dissuaded by the incomplete record as presented by the Appellant to the District Coordinator and her staff.

In fact, it is not necessary, nor even possible, for this Court to revisit the merits of JO #2-169. However, the request for JO #2-241 revealed the factual mistakes upon which the Assistant Coordinator relied because, by the time the District Coordinator issued JO #2-241, it had been revealed to her that the development was not completed as authorized in the original permit. For these same reasons, we await the full presentation of relevant evidence at trial in this de novo appeal of JO #2-241.

In a de novo appeal, the Legislature has directed that this Court apply the substantive standards that were applicable to the tribunal below. 10 V.S.A. § 8504(h). Therefore, we will apply the standards applicable when the District Coordinator made her determination on the jurisdictional questions posed by Appellants. It is undisputed that Luzenac did not have permit authority to deviate from the plans as submitted. Had they constructed the swale and holding ponds as permitted, then water would have flowed to the planned location. Although a site plan

---

[19] "Material change" means any change to a permitted development or subdivision which has a significant impact on any finding, conclusion, term or condition of the project's permit and which may result in an impact with respect to any of the criteria specified in 10 V.S.A. Section 6086(a)(1) through (a)(10).

[20] The Permittee made references to the handling of water, erosion, runoff and the capacity of the land to hold water in Land Use Permit #2W0551 and its amendments, and in the October 2, 2002 letter from Luzenac representative Henry Clay to the Assistant District #2 Coordinator.

map is not a numbered condition of a permit, it still holds authority over the project. A site plan map controls a site as would any specifically enumerated condition. "Act 250 permits allow a property owner to conduct the improvements specifically authorized by the permit, but no more than that. When property owners wish to complete further improvements to a property already subject to an Act 250 permit, they may be allowed to do so only after submitting the proposed improvements in a permit amendment application." In re: Mountainside Properties, Inc, Docket No. 117-6-05 Vtec, slip op. at 8 (Vt. Envtl. Ct., Dec. 13, 2005). Because Luzenac changed their site plan, without permit authority, they were out of compliance with the existing permit conditions. The District Coordinator relied on the site plans as presented in the original permitting procedure. While these site plans are not numbered conditions, they still must be adhered to, or in the alternative, amended.

When an applicant intends to materially deviate from plans upon which a permit is based, it has an affirmative duty to highlight these deviations for the Commission and present an amendment application. Although not all amendments require a Stowe Club analysis,[21] In re Stowe Club Highlands, 166 Vt. 33, p. 38 (1996), still the owner must inquire about a permit amendment. It is not the duty of the District Commission or the District Coordinator to investigate independently whether a permittee has conformed to their submitted plans.

**Effect of the Expiration of Permit #2W0551**

Land Use Permit #2W0551 provided that "[t]his permit shall expire on October 15, 2002, unless extended by the District Commission." The Appellant and the Commission allowed the permit to expire on that date pursuant to 10 V.S.A. § 6090(b)(1).[22] If construction had, in fact, been completed in compliance with the Permit, and the Permit had expired, then Act 250 jurisdiction would have ended. However, the record presently before us, particularly when viewed in a light most favorable to those parties opposing the pending summary judgment motion, shows that the Permittee is not in compliance with Land Use Permit #2W0551. The expiration of the permit for a development that is not in compliance with permit conditions is not

---

[21] The Vermont Supreme Court provided an outline of the circumstances, in an Act 250 context, where permit amendments could be justified: "(a) changes in factual or regulatory circumstances beyond the control of a permittee; (b) changes in the construction or operation of the permittee's project, not reasonable foreseeable at the time the permit was issued; or (c) changes in technology." In re Stowe Club Highlands, 166 Vt. 33, p. 38 (1996).

[22] 10 V.S.A. § 6090(b)(1) provides that "[a]ny permit…for extraction of mineral resources…shall be for a specified period determined by the board in accordance with the rules adopted under this chapter as a reasonable projection of the time during which the land will remain suitable for use if developed or subdivided as contemplated in the application, and with due regard for the economic considerations attending the proposed development or subdivision."

11

dispositive for a jurisdiction analysis. The Permittee obtained the expiration through misrepresentations, intentional or not. Thus, jurisdiction should continue.

## Huntley Doctrine

In Huntley, the Vermont Supreme Court held that Act 250 jurisdiction ended because the mineral extraction permit had expired and the site had been reclaimed. In re Huntley, 2004 VT 115. Huntley involved the extraction of gravel from a five-acre segment of a ninety-seven-acre farm in Bethel. Id. at ¶ 2. The Environmental Board concluded that all reclamation had, in fact, been completed in compliance with the permit and there was no question of failure to comply with the approved plans.[23] The Vermont Supreme Court on appeal made clear that because the Huntleys had ceased the sand and mining operation and reclaimed the land, they were not conducting any activity that constituted development and "the Board has no enforcement authority over the Huntley's land because no development [wa]s taking place." Huntley at ¶ 9. The Court held that, after a gravel permit expires, and after a site is reclaimed, the Board can not retain jurisdiction merely to enforce compliance with the reclamation plan. "[T]he Board has the power to require compliance with the plan by setting the permit expiration date beyond reclamation." Id at ¶ 14; 10 V.S.A § 6086(a)(9)(E)(ii). In the event that the Board does not extend the permit expiration date, "when an Act 250 permit expires pursuant to 10 V.S.A. § 6090(b)(1), the land is no longer subject to Act 250 jurisdiction absent some activity to trigger the statute's application." Huntley at ¶ 1. (Emphasis added.)

Huntley is readily distinguishable from the present case because the permittee was not in compliance with permit conditions; they conducted development activity not authorized by their permit. Unlike the Huntley case, the development was not completed in accordance with the permit. Environmental impacts continue at the Hamm Mine property. We see a material contrast with the Huntley project, which was in full compliance both with the reclamation plan and all permit conditions at the time the permit expired. In the present case, the property was not in compliance with all permit conditions and, had the District Commission been notified of the non-compliance,[24] it would have had the opportunity to extend the permit in order to ensure that development was finished and the reclamation had been completed. In addition, there have been

---

[23] Re: Richard and Elinor Huntley, Declaratory Ruling #419, Mem. Decision, p. 8 (Vt. Envtl. Bd., Jul. 3, 2003), reversed by In re Huntley, 2004 VT 115.

[24] These Act 250 criteria include: 10 V.S.A. § 6086(a)(4) (soil erosion and water retention); 10 V.S.A. § 6086(a)(8) (site aesthetics).

material changes to the Hamm Mine property which constitute continuing development subject to Act 250 pursuant to Rule 34(A). Therefore, Huntley is not controlling authority in this jurisdictional analysis.

**Related Proceedings in Windham Superior Court**

By Order of the Windham Superior Court, Appellants Reese have been directed to lower the level of the Hamm Mine pond by fifteen feet no later than October 1, 2007, absent a showing of good cause. While our decision addresses only the narrow issue of Act 250 jurisdiction, it is necessary to notify the Appellants Reese that a rapid lowering of the mine pond may require additional regulatory permits in order to protect neighboring properties.

<b>Conclusion</b>

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellants' motion for summary judgment is **DENIED**.

The final pre-trial telephone conference for this case has been rescheduled for Monday, October 1, 2007 at 4:00 PM. At that time, the Court will discuss all outstanding trial procedure issues, including the order in which evidence will be received. Normally, the Court first takes evidence in de novo proceedings from the applicant, whether the applicant is the appellant or not. We have no application pending in this appeal. Nonetheless, the Court would prefer to first hear evidence from Luzenac, so as to first hear its representations of the development activity that occurred at the Hamm Mine site after Permit #2W0551 was issued. We are willing to entertain any alternate trial procedures that any party may wish to propose at the pre-trial conference.

Done at Berlin, Vermont, this 27th day of September, 2007.

_____
Thomas S. Durkin, Environmental Judge